Lisa M. VIERS, Plaintiff,

v.

Michael J. ASTRUE, Commissioner of Social Security, Defendant.

No. C08–2005.

United States District Court,
N.D. Iowa,
Eastern Division.

Oct. 22, 2008.

Jeffrey P. Berg, Cedar Rapids, IA, Thomas A. Krause, West Des Moines, IA, for Plaintiff.

Stephanie Johnson Wright, U.S. Attorney's Office, Cedar Rapids, IA, for Defendant.

## RULING ON JUDICIAL REVIEW

JON STUART SCOLES, United States Magistrate Judge.

### TABLE OF CONTENTS

I. INTRODUCTION ................................................1112

II. PRIOR PROCEEDINGS..........................................1112

III. PRINCIPLES OF REVIEW.......................................1113

IV. FACTS ........................................................1114
 A. Viers' Education and Employment Background ........................1114
 B. Administrative Hearing Testimony ...............................1114
 1. Viers' Testimony ........................................1114
 2. Vocational Expert Testimony .............................1115
 C. Viers' Medical History ......................................1116

V. CONCLUSIONS OF LAW .......................................1119
 A. ALJ's Disability Determination ...............................1119
 B. Was Viers' Drug Use a Material Factor Contributing to Her
 Disability? ...............................................1121
 C. Reversal or Remand .......................................1124

VI. CONCLUSION ................................................1125

VII. ORDER ......................................................1125

### I. INTRODUCTION

This matter comes before the Court on the Complaint (docket number 6) filed by Plaintiff Lisa M. Viers on January 28, 2008, requesting judicial review of the Social Security Commissioner's decision to deny her applications for Title II disability insurance benefits, Title II child's insurance benefits, and Title XVI supplemental security income ("SSI") benefits. Viers asks the Court to reverse the decision of the Social Security Commissioner ("Commissioner") and order the Commissioner to provide her disability insurance benefits, child's insurance benefits, and SSI bene-fits. In the alternative, Viers requests the Court to remand this matter for further proceedings.

### II. PRIOR PROCEEDINGS

On January 12, 2004, Viers applied for disability insurance benefits, child's insurance benefits, and SSI benefits. In her applications for disability insurance benefits and child's insurance benefits, Viers alleged an inability to work since July 27, 1999. In her application for SSI benefits, Viers alleged an inability to work since December 26, 2003. Viers alleged that she was unable to work due to social anxiety,

depression, and hepatitis C. All three of her applications were denied on February 12, 2004. On May 17, 2004, her applications were denied on reconsideration. On July 26, 2004, Viers requested an administrative hearing before an Administrative Law Judge ("ALJ"). On March 15, 2006, Viers appeared without counsel, via video conference, before ALJ John P. Johnson. Viers and vocational expert Carma Mitchell testified at the hearing. In a decision dated September 7, 2006, the ALJ denied Viers' claim. The ALJ determined that Viers was not disabled and was not entitled to disability insurance benefits, child's insurance benefits, or SSI benefits because if she stopped her substance use, she would be capable of making a successful adjustment to work that exists in significant numbers in the national economy. Viers appealed the ALJ's decision. On November 13, 2007, the Appeals Council denied Viers' request for review. Consequently, the ALJ's September 7, 2006 decision was adopted as the Commissioner's final decision.

On January 28, 2008, Viers filed this action for judicial review. The Commissioner filed an answer on April 18, 2008. On May 26, 2008, Viers filed a brief arguing there is not substantial evidence in the record to support the ALJ's finding that she is not disabled and that if she stopped her substance use, she could perform work in the national economy. On July 18, 2008, the Commissioner filed a responsive brief arguing the ALJ's decision was correct and asking the Court to affirm the ALJ's decision. On March 8, 2008, both parties consented to proceed before the undersigned in this matter pursuant to the provisions set forth in 28 U.S.C. § 636(c).

### III. PRINCIPLES OF REVIEW

Title 42, United States Code, Section 405(g) provides that the Commissioner's final determination following an administrative hearing not to award disability insurance benefits or child's insurance benefits is subject to judicial review. 42 U.S.C. § 405(g). Pursuant to 42 U.S.C. § 1383(c)(3), the Commissioner's final determination after an administrative hearing not to award SSI benefits is subject to judicial review to the same extent as provided in 42 U.S.C. § 405(g). 42 U.S.C. § 1383(c)(3). 42 U.S.C. § 405(g) provides the Court with the power to: "[E]nter ... a judgment affirming, modifying, or reversing the decision of the Commissioner ... with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner ... as to any fact, if supported by substantial evidence, shall be conclusive ..." *Id.*

██ The Court must consider "whether the ALJ's decision is supported by substantial evidence on the record as a whole." *Vester v. Barnhart,* 416 F.3d 886, 889 (8th Cir.2005) (citing *Harris v. Barnhart,* 356 F.3d 926, 928 (8th Cir.2004)). Evidence is "substantial evidence" if a reasonable person would find it adequate to support the ALJ's determination. *Id.* (citing *Sultan v. Barnhart,* 368 F.3d 857, 862 (8th Cir.2004)). Furthermore, "[s]ubstantial evidence is 'something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions does not prevent an administrative agency's findings from being supported by substantial evidence.'" *Baldwin v. Barnhart,* 349 F.3d 549, 555 (8th Cir.2003) (quoting *Cruse v. Bowen,* 867 F.2d 1183, 1184 (8th Cir.1989), in turn quoting *Consolo v. Fed. Mar. Comm'n,* 383 U.S. 607, 620, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966)).

██ In determining whether the ALJ's decision meets this standard, the Court considers "all of the evidence that was before the ALJ, but it [does] not reweigh the evidence." *Vester,* 416 F.3d at 889 (citing *Guilliams v. Barnhart,* 393 F.3d 798, 801 (8th Cir.2005)). The Court

not only considers the evidence which supports the ALJ's decision, but also the evidence that detracts from his or her decision. *Guilliams,* 393 F.3d at 801. "[E]ven if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole." *Id.* (citing *Chamberlain v. Shalala,* 47 F.3d 1489, 1493 (8th Cir.1995)).

## IV. FACTS

### A. Viers' Education and Employment Background

Viers was born in 1979. She completed the eleventh grade. After leaving school, she received no further training or education. The record contains a detailed earnings report for Viers. According to the report, Viers worked at various places from 1995 to 2001, and had nominal earnings ranging from a low of $84.00 in 2001 to a high of $2,389.53 in 2000. From 2002 through 2004, she worked for a temporary job agency. Her jobs included parking booth attendant and commercial building cleaner. She earned $3,804.00 in 2002, $3,517.50 in 2003, and $1,326.00 in 2004. Viers had no earnings in 2005.

### B. Administrative Hearing Testimony

#### 1. Viers' Testimony

At the administrative hearing, Viers appeared before the ALJ without legal representation and was questioned by the ALJ. The ALJ first asked her what prevented her from holding a job. Viers replied that stress, anxiety, and a social disorder kept her from working. She further explained that holding a job is difficult because she does not like being around people or crowds. Viers also indicated that her anxiety problems make her physically sick and require hospitalization.

Next, the ALJ asked Viers a series of questions regarding her functional capacity. When asked whether she had any difficulty walking, standing, or sitting, Viers answered "I don't, I can't stand up too long on my own[ ] ... [because] I get really tired very easy."[1] The ALJ also asked Viers whether she had any problems remembering things. She replied that she had difficulty remembering day-to-day things. The ALJ continued this line of questioning:

Q: Do you have any problems keeping your mind on things?

A: Yes.

Q: What happens? Do you get distracted, your mind wander or what happens?

A: I get distracted or my thoughts don't stay concurrent. They just, I blank out.

Q: Do you have any problems understanding things?

A: Sometimes.

Q: What happens? What type of problems do you have with understanding things? Are these because they're too complex? You don't understand the nature about what people are talking about? What's the problem.

A: For example, like if I read something, I have to read it out loud or I don't understand what it, what it's saying. Or sometimes people have to repeat themselves because I don't understand what they say the first time.

(Administrative Record at 527–28.) Lastly, the ALJ asked Viers whether she has difficulty handling stress or pressure. Viers explained that difficult tasks, too many things going on at one time, and people ordering her around causes her stress. She testified that when under stress, she

---

1. *See* Administrative Record at 527.

gets nervous, can't breathe, feels sick, and becomes angry.

The ALJ also asked Viers to describe her difficulties with depression and anxiety. Viers indicated that she isolates when she is depressed. She also does not go out in public or talk to other people when she is depressed. She testified that she reacts to anxiety in the same manner that she reacts to depression. Additionally, she indicated that when anxiety and stress were combined, she has stomach problems, feels sick, has difficulty breathing, and feels overwhelmed.

The ALJ further inquired as to Viers' activities of daily living. Viers testified that she wakes up around 10:00 a.m. and goes to bed around 8:00 p.m. According to Viers, she has no difficulty sleeping. The ALJ continued his questioning:

Q: Do you have any problems performing activities, such as bathing, dressing and feeding yourself?

A: I get lazy sometimes and won't do it for a couple of days.

Q: When you get up, do you have breakfast?

A: Cigarettes and coffee.

Q: How would you spend the rest of your morning? What would you be doing?

A: Watching TV.... Q: How do you spend the afternoon?

A: Watching TV.... Q: What about the evening? How do you spend the evening?

A: The same.

Q: Do you have any activities or hobbies that you engage in?

A: I go to my appointments that I need for my mental and for my daughter. Otherwise, I really don't do much of anything....

Q: Around your apartment, do you take care of the chores, all the chores, yourself?

A: Yes.

Q: Do you do things like grocery shop, things of that sort?

A: Yes sir. My mother usually takes me grocery shopping though.

Q: Do you have any problems being around people in the grocery store?

A: Try to make it as fast as I can.

Q: Why is that?

A: Because I don't like the crowds and bumping into people.

(Administrative Record at 530–31.)

The ALJ also asked Viers about her past drug use and treatment. When asked whether her medications had a beneficial effect on her depression and anxiety when she was not using drugs, Viers replied that her medications were effective. Viers noted that the benefits of the medications ceased when she was using methamphetamine and marijuana.

### 2. *Vocational Expert Testimony*

At the hearing, the ALJ provided vocational expert Carma Mitchell with a hypothetical for an individual who:

is not able to do very complex or technical work but is able to do more than simple, routine repetitive work that does not require constant close attention to detail or use of independent judgment for decision-making. [The individual] can have only occasional contact with the public, but brief, superficial interaction is tolerated. [The individual] does require occasional supervision. [The individual] should not work at more than a regular pace, and that's using three speeds of pace, being fast, regular, and slow.

(Administrative Record at 539.) The vocational expert testified that under such limitations, Viers could perform her past relevant work as a cleaner/housekeeper. The

vocation expert also testified that Viers could perform the following unskilled work: (1) sales attendant (1,900 positions in Iowa and 183,000 positions in the nation), (2) dietary aide (900 positions in Iowa and 56,000 positions in the nation), (3) day worker (3,800 positions in Iowa and 421,000 positions in the nation), and (4) inserting machine operator (200 positions in Iowa and 16,000 positions in the nation).

The ALJ provided the vocational expert with a second hypothetical for an individual who:

> would be limited to only simple, routine, repetitive work that does not require close attention to detail or use of independent judgment or decision-making with only occasional contact with the public. [The individual] does require occasional supervision, and [he or] she should not work at more than a regular pace.

(Administrative Record at 541.) Under these limitations, the vocational expert testified that Viers could perform the same jobs outlined under the first hypothetical.

### C. Viers' Medical History

On March 16, 2000, Viers presented in the emergency room at the Covenant Medical Center in Waterloo, Iowa. Viers had taken and overdose of Ativan because she wanted to "go to sleep" and stop using methamphetamine. Viers was diagnosed with depression with suicidal ideation and drug abuse. She was admitted for 24 hours under the care of Dr. P.B. Raju, M.D.

On January 14, 2001, Viers presented in the emergency room at the Covenant Medical Center for IV methamphetamine abuse. Viers also complained of headaches and anxiety. She was diagnosed with chemical dependancy and admitted to Pathways Behavioral Services ("Pathways") for in-treatment substance abuse

recovery services. Viers left Pathways on January 16, 2001, against medical advise.

On March 23, 2001, after being arrested and jailed for methamphetamine use, police brought Viers to the Covenant Medical Center emergency department for treatment. She was admitted for detoxification. She was diagnosed with IV methamphetamine abuse and history of anxiety and depression.

On July 13, 2001, Viers met with Dr. David Breitkreuz, M.D., complaining of problems with anxiety and panic attacks. She explained that her problems had worsened since the death of her father on June 3, 2001. According to Viers, her anxiety and panic attacks included chest tightness, jitteriness, and upset stomach. Dr. Breitkreuz diagnosed Viers with depression, anxiety, and panic disorder. Dr. Breitkreuz prescribed medication as treatment.

On July 31, 2001, Viers was evaluated by Terry Kuenning ("Kuenning"), LISW, a psychiatric social worker. Viers informed Kuenning that she had been depressed since the death of her father in June 2001. In assessing her mental abilities, Kuenning found Viers' attention span and concentration to be abnormal. Specifically, Kuenning noted that Viers "spaces out" at times. Kuenning also found that Viers had: (1) low energy level and motivation; (2) crying spells; (3) suicidal thoughts; (4) difficulty falling asleep and waking up; and (5) rapid heart rate, sweats, fears, and irritability due to anxiety. Kuenning diagnosed her with depressive disorder, methamphetamine abuse, and personality disorder. Kuenning recommended psychotherapy and medication as treatment.

On January 12, 2002, police took Viers to the emergency department at Covenant Medical Center to get her help with methamphetamine abuse. Dr. Geoffrey Miller, M.D., noted that Viers had been using

methamphetamine on a daily basis, and had recently discovered that she was 3–4 months pregnant. She was admitted to Horizons, a substance abuse recovery center, for treatment of her drug addiction. On January 13, 2002, Viers left Horizons and told program personnel that she would follow-up with Pathways.

On March 5, 2003, Viers met with Dr. Michael J. Farris, M.D., regarding her anxiety disorder. Dr. Farris noted that Xanax provided relief to her symptoms. In addition to Xanax, Dr. Farris started her on Paxil as treatment. On April 15, 2003, Viers had a follow-up appointment with Dr. Farris. Viers informed Dr. Farris that she was unable to tolerate the Paxil and discontinued using it. Dr. Farris noted that she also began tapering off the Xanax on her own. Dr. Farris opined that her "[a]nxiety symptoms have been fairly well controlled while the Xanax has been tapered."[2] Dr. Farris recommended that she continue to taper off the Xanax.

On December 10, 2003, Viers had a follow-up appointment with Kuenning. Upon examination, Kuenning found Viers' mood to be depressed, angry, and anxious. Kuenning noted that Viers' recent memory was poor and her attention span and concentration were abnormal. Kuenning further noted that she had: (1) crying spells, (2) low motivation, (3) feelings of excessive guilt, (4) difficulty falling asleep and waking up, and (5) rapid heart rate, sweats, fears, agitation, and irritability due to anxiety. Kuenning diagnosed her with major depression, recurrent, panic disorder with agoraphobia, and polysubstance dependence (in remission). Kuenning recommended psychotherapy and medication as treatment.

On February 11, 2004, Dr. Rhonda Lovell, Ph.D., reviewed Viers' medical records and provided Disability Determination Services ("DDS") with a Psychiatric Review Technique assessment and a mental residual functional capacity ("RFC") assessment for Viers. On the Psychiatric Review Technique assessment, Dr. Lovell diagnosed Viers with major depressive disorder, panic disorder with agoraphobia, polysubstance dependence in remission, and obsessive compulsive personality features. Dr. Lovell determined that Viers had the following limitations: mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. On the mental RFC assessment, Dr. Lovell determined that Viers was moderately limited in her ability to: maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, complete a normal workday and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, and get along with co-workers or peers without distracting them or exhibiting behavioral extremes. Dr. Lovell concluded that:

> Based on educational background with no special education and mental status estimates of average intellectual functioning, [Viers] is capable of understanding and remembering instructions and procedures for basic and detailed tasks. Treatment notes and [activities of daily living] suggest no more than moderate reductions in [Viers'] ability to sustain concentration to carry out tasks. [Viers] appears to have moderate difficulties interacting appropriately

---

**2.** *See* Administrative Record at 258.

with others but can exhibit good social skills when motivated to do so. [Viers'] treatment history suggests moderate interruptions in her ability to regularly complete a typical work week. This assessment is consistent with the evidence of record.

(Administrative Record at 361.)

On August 5, 2004, Viers had a clinical interview with Karen K. LeGore ("LeGore") at Horizons. Viers informed LeGore that she had started using methamphetamine again. She had been taking methamphetamine two to three times per week for one month. LeGore opined that Viers was "very resistive to comply with treatment expectations. [Viers] reports previous treatment experience however she seems to be resistant and very negative towards treatment and support network."[3] LeGore recommended that Viers continue psychiatric counseling and therapy as treatment.

On August 30, 2004, Viers met with Dr. Ricky R. McCormick, D.O., for substance abuse. Viers informed Dr. McCormick that she had been using methamphetamine "everyday for quite some time" and she needed help. Dr. McCormick diagnosed her with substance abuse and admitted her for detoxification. Dr. McCormick also prescribed Ativan as treatment.

On January 11, 2005, Viers met with Jill Gaulke Harlan ("Harlan"), an occupational therapist, complaining of numbness and a decrease in strength and coordination with her left hand and wrist following a slip and fall on ice. Upon examination, Harlan found that Viers':

left upper extremity ... includes ... active range of motion for the wrist, as well as for the hand and fingers [which] are grossly within functional limits[.] ... Grip strength per dynamometer

testing is 25 pounds for the left versus 60 pounds for the right. Tip pinch for the left is 7.5 pounds, 9.5 pounds for the palmar pinch, and 8.5 pounds for lateral pinch. All of these numbers for the left hand are below norms, and her grip strength of course is markedly weak. OT had [Viers] complete a writing sample, particularly for signing her name. [Viers'] letters are barely legible except for the first letters of her first and last name. She does demonstrate a dysfunction with her coordination and dexterity at this time. Her sensation is grossly intact and with some movements and resistance, she reports a feeling of some brief shooting pain through her wrist[.] ... The pain goes away as soon as the resistance is removed.

(Administrative Record at 429.) Harlan suggested that Viers work with an occupational therapist for one week, and then implement a home exercise program to strengthen her left hand and wrist.

On April 11, 2005, Viers presented at the emergency room of the Covenant Medical Center for help with substance abuse. She had been using methamphetamine everyday for the past couple of weeks. Dr. Robert Roof, M.D., diagnosed Viers with methamphetamine dependence and admitted her for detoxification. Following detoxification, Viers was voluntarily admitted to Horizons and worked again with Karen LeGore. LeGore noted that throughout her stay, Viers "was very argumentative and continually resistant to comply with treatment expectations."[4] Viers was discharged from Horizons for noncompliance on April 18, 2005.

On August 8, 2005, Viers reported to the emergency department at the Covenant Medical Center, claiming that she was suicidal because DHS removed her daughter

**3.** *See* Administrative Record at 459.

**4.** *See* Administrative Record at 410.

from her home earlier that day. Dr. Roof diagnosed Viers with suicidal ideation and history of depression and substance abuse. She was admitted to the hospital. She was discharged on August 11, 2005. Dr. Carl Aagesen, D.O., provided the following discussion of Viers' hospital stay:

> [Viers] was generally uncooperative with treatment, isolated herself, did not talk to staff and was negative and irritable.... She stated that her meds were not regulated and I told her that they were and that she was ready for discharge. She then reported to the staff that she was suicidal. I informed the staff to tell her that she would in that case need long term hospitalization and she immediately denied suicidal thoughts, stating that she would not harm herself, ... and felt ready for discharge.

(Administrative Record at 392–93.)

On September 23, 2005, Viers met with Dr. Piburn for supportive therapy and medication management. Dr. Piburn noted that his nurse believed that Viers had unusual irritability. Specifically, Dr. Piburn stated that:

> [his nurse] has seen such irritability in such patients with bipolar disorder. This is not [Viers'] usual diagnosis, but she does have a past history of psychotic features, which can be seen in bipolar, or unfortunately with substance abuse. [Viers] describes mind racing, not being able to keep her thoughts straight and flying off the handle, which means that she at least has some bipolar traits.

(Administrative Record at 476.) Dr. Piburn found no change in her diagnosis of major depression, recurrent, panic disorder with agoraphobia, and polysubstance dependence (in remission), but noted the bipolar features. Dr. Piburn continued her medications as treatment.

## V. CONCLUSIONS OF LAW

### A. ALJ's Disability Determination

The ALJ determined that Viers is not disabled. In making this determination, the ALJ was required to complete the five-step sequential test provided in the social security regulations. *See* 20 C.F.R. § 404.1520(a)-(f); *Bowen v. Yuckert,* 482 U.S. 137, 140–42, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987); *Page v. Astrue,* 484 F.3d 1040, 1042 (8th Cir.2007); *Anderson v. Barnhart,* 344 F.3d 809, 812 (8th Cir. 2003). The five steps an ALJ must consider are:

> (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work.

*Goff v. Barnhart,* 421 F.3d 785, 790 (8th Cir.2005) (citing *Eichelberger v. Barnhart,* 390 F.3d 584, 590 (8th Cir.2004)); *see also* 20 C.F.R. § 404.1520(a)-(f). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." *Eichelberger,* 390 F.3d at 590–91 (citing *Ramirez v. Barnhart,* 292 F.3d 576, 580 (8th Cir.2002)).

"To establish a disability claim, the claimant bears the initial burden of proof to show that he [or she] is unable to perform his [or her] past relevant work." *Frankl v. Shalala,* 47 F.3d 935, 937 (8th Cir.1995) (citing *Reed v. Sullivan,* 988 F.2d 812, 815 (8th Cir.1993)). If the claimant meets this burden, the burden of proof then shifts to the Commissioner to demonstrate that the claimant retains the residual functional capacity to perform a signifi-

cant number of other jobs in the national economy that are consistent with claimant's impairments and vocational factors such as age, education, and work experience. *Id.* The RFC is the most an individual can do despite the combined effect of all of his or her credible limitations. 20 C.F.R. § 416.945. " 'It is the ALJ's responsibility to determine a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of his [or her] limitations.' " *Tellez v. Barnhart,* 403 F.3d 953, 957 (8th Cir.2005) (quoting *Pearsall v. Massanari,* 274 F.3d 1211, 1217 (8th Cir.2001)).

The ALJ applied the first step of the analysis and determined that Viers had not engaged in substantial gainful activity since her alleged onset date, July 27, 1999. At the second step, the ALJ concluded, from the medical evidence, that Viers had the following severe combination of impairments: major depressive disorder, anxiety disorder with history of panic disorder, obsessive compulsive disorder and agoraphobia, and hepatitis C.[5] At the third step, the ALJ determined that "[i]f [Viers] stopped the substance use, [she] would not have an impairment or combination of impairments that meets or medically equals any of the impairments listed in 20 C.F.R. [§ ] 404, [Appendix 1, Subpart P, Regulations No. 4 (the Listing of Impairments) ]." [6] At the fourth step, the ALJ found that if Viers stopped the substance abuse, she would have the residual functional capacity to:

perform at an unlimited exertion capacity. [Viers] could not do very complex or technical work but could do more than simple, routine, repetitive work that does not require constant close attention to detail, the use of independent judgment, or more than occasional contact with the public. [Viers] needs only occasional supervision, and could work at a regular pace.

5. With regard to Viers' hepatitis C, the ALJ determined that "this impairment does not cause significant symptoms or limitations, and is therefore found to be non-severe." *See* Administrative Record at 20.

6. Initially, at step three, the ALJ determined that "[Viers'] mental impairments, including the substance use disorder(s), do not meet section(s) 12.04, 12.06, and 12.09 of 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d) and 416.920(d))." *See* Administrative Record at 20. Specifically, the ALJ found that:

Based on the mental evidence shown above including her substance abuse, and other evidence of record, the undersigned finds [Viers] to have a mild limitation in the area of activities of daily living, marked difficulties in maintaining social function, marked difficulties in maintaining concentration, persistence or pace, and four or more repeated episodes of decompensation, each of extended duration within the period evaluated. The evidence does not establish the presence of the C Criteria.

*See* Administrative Record at 21. However, both Viers and the Commissioner agree that the ALJ's decision contains a typographical error because his findings suggest that Viers *did* meet an impairment listed in 20 C.F.R. § 404, Appendix 1, Subpart P, Regulations No. 4 (the Listing of Impairments). *See* Viers' Brief at 3, n. 6 ("It appears the ALJ's decision contains a typographical error in concluding Ms. Viers did not meet the Listings. The ALJ found [Viers] was markedly impaired in social functioning, marked difficulties in maintaining concentration, persistence, and pace, and four or more episodes of decompensation. This is consistent with disability meetings [sic] the Listings. 20 C.F.R. § 404.1520a."); Commissioner's Brief at 5 ("It appears that, contrary to the heading in finding No. 5, that the ALJ found that, considering all [Viers'] impairments including substance abuse, she met or equaled an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing of Impairments."). Ultimately, however, the ALJ concluded at step three, that if Viers stopped her substance use, she would not have an impairment which meets the Listings. *See* Administrative Record at 21, ¶ 7.

Under the fourth step, the ALJ determined that Viers would be unable to perform her past relevant work. At the fifth step, the ALJ determined that if Viers abstained from substance use, then based on her age, education, previous work experience, and RFC, she could work at jobs that exist in significant numbers in the national economy. Therefore, the ALJ concluded Viers was "not disabled."

### B. Was Viers' Drug Use a Material Factor Contributing to Her Disability?

Viers contends that the ALJ erred in three respects. First, Viers argues that "[t]he ALJ erred in concluding [she] was disabled but that drug addiction or alcoholism was a material factor contributing to her disability as the evidence purportedly supporting such a finding came when [her] drug addiction had been in sustained remission and the ALJ misinterpreted [her] GAF score."[7] Next, Viers argues that the ALJ failed to fully and fairly develop the record with regard to her cellulitis. Lastly, Viers argues that the ALJ's decision is not supported by substantial medical evidence from an examining source.

In making his determination that substance use was a material factor contributing to her disability, Viers points out that the ALJ relied on a Global Assessment of Functioning ("GAF") score of 50 when her substance use was in remission, to show that her functional limitations only resulted in "moderate symptoms." Viers argues that such reliance was in error. Viers maintains that a GAF score of 50 indicates "serious symptoms" consistent with a claim for disability. Viers suggests that the ALJ's error may be the result of his reliance on state agency psychological consultants who "originated the mistake that a GAF of 50 was consistent with 'moder-

ate' rather than 'serious' limitations."[8] Thus, Viers asserts that the consultative psychological reports cannot constitute substantial evidence to support the ALJ's claim. Viers maintains that remand for further consideration is appropriate so that the ALJ may explain and clarify his decision with regard to the materiality of Viers' substance abuse as it pertains to her disability.

In 1996, Congress amended the Social Security Act to eliminate benefits for disabilities arising from addiction to alcohol or other drugs. *See* Pub.L. No. 104–121, 110 Stat. 847; *see also Brueggemann v. Barnhart*, 348 F.3d 689, 693 (8th Cir.2003) (discussing the 1996 Congressional amendment); *Jackson v. Apfel*, 162 F.3d 533, 537 (8th Cir.1998) (same). The regulations implemented this law at 20 C.F.R. § 404.1535 (relating to applications for disability insurance benefits and child's insurance benefits) and 20 C.F.R. § 416.935 (relating to applications for SSI benefits). The two sections are identical and provide as follows:

> How we will determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability.
>
> (a) General. If we find that you are disabled and have medical evidence of your drug addiction or alcoholism, we must determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability.
>
> (b) Process we will follow when we have medical evidence of your drug addiction or alcoholism.
>
>> (1) The key factor we will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether we would still find

---

7. *See* Viers' Brief at 11.

8. *Id.* at 15.

you disabled if you stopped using drugs or alcohol.

(2) In making this determination, we will evaluate which of your current physical and mental limitations, upon which we based our current disability determination, would remain if you stopped using drugs or alcohol and then determine whether any or all of your remaining limitations would be disabling.

(I) If we determine that your remaining limitations would not be disabling, we will find that your drug addiction or alcoholism is a contributing factor material to the determination of disability.

(ii) If we determine that your remaining limitations are disabling, you are disabled independent of your drug addiction or alcoholism and we will find that your drug addiction or alcoholism is not a contributing factor material to the determination of disability.

20 C.F.R. § 416.935.

 According to the regulations, the ALJ must first determine whether the claimant is disabled. *See* 20 C.F.R. § 416.935 ("*If we find that you are disabled* and have medical evidence of your drug addiction or alcoholism, we must determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability." (emphasis added)). "The ALJ must reach this determination initially ... using the five-step approach described in 20 C.F.R. § 404.1520 without segregating out any effects that might be due to substance use disorders." *Brueggemann*, 348 F.3d at 694 (citation omitted). This determination must be based on "substantial evidence of [the claimant's] medical limitations without deductions for the assumed effects of substance use disorders." *Id.* If the ALJ determines that all of a claimant's limitations, including the effects of substance

use disorders, show that the claimant is disabled, then the ALJ "must next consider which limitations would remain when the effects of the substance use disorders are absent." *Id.* at 694–95 (citing *Pettit v. Apfel*, 218 F.3d 901, 903 (8th Cir.2000); 20 C.F.R. § 404.1535(b)(2)). "The focus of the inquiry is on the impairments remaining if the substance abuse ceased, and whether those impairments are disabling, regardless of their cause." *Pettit*, 218 F.3d at 903 (citations omitted). The claimant carries the burden of proving that alcoholism or drug addiction is not a material factor to the finding of disability. *Estes v. Barnhart*, 275 F.3d 722, 725 (8th Cir.2002) (citing *Mittlestedt v. Apfel*, 204 F.3d 847, 852 (8th Cir.2000)). "If the ALJ is unable to determine whether substance abuse disorders are a contributing factor material to the claimant's otherwise-acknowledged disability, the claimant's burden has been met and an award of benefits must follow. . . . In colloquial terms, on the issue of materiality of alcoholism, a tie goes to [the claimant]." *Brueggemann*, 348 F.3d at 693 (citation omitted). Accordingly, the ALJ is required to develop a full and fair record and support his or her conclusions with substantial evidence. *Id.* at 695. In summary, "[o]nly after the ALJ has made an initial determination 1) that [the claimant] is disabled, 2) that drug or alcohol use is a concern, and 3) that substantial evidence on the record shows what limitations would remain in the absence of alcoholism[,] ... may [the ALJ] then reach a conclusion on whether [the claimant's] substance use disorders are a contributing factor material to the determination of disability." *Id.*

 Upon review of his decision, it appears that the ALJ followed the necessary steps set forth in the Social Security Regulations and case law for determining whether Viers' substance use was a contributing factor in her disability. Specifically, the ALJ found that, including her

substance use, Viers was markedly impaired in social functioning, had marked difficulties in maintaining concentration, persistence, and pace, and had four or more episodes of decompensation. The ALJ also determined, however, that if Viers stopped her substance use, she would have "a mild limitation in the area of activities of daily living, moderate difficulties in maintaining social function, moderate difficulties in maintaining concentration, persistence, or pace, and no repeated episodes of decompensation." [9] In order to support this conclusion, the ALJ found that Viers:

> during reported remission of her substance abuse disorder was opined by treating practitioner's [sic] to have a globally assessed functioning level (GAF) of 50, with a score of 55 within the past year. However, [Viers'] assigned GAF represents symptoms of moderate severity, which would not preclude all work.

(Administrative Record at 22.)

A GAF score is a determination based on a scale of 1 to 100 of a "clinician's judgment of the individual's overall level of functioning." *Hudson ex rel. Jones v. Barnhart*, 345 F.3d 661, 662 n. 2 (8th Cir.2003) (quoting *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Revision 2000)). The Eighth Circuit Court of Appeals has noted that a GAF score of 50 "reflects *serious limitations* in the patient's general ability to perform basic tasks of daily life." *Brueggemann*, 348 F.3d at 695 (emphasis added). A GAF score of 55 is "indicative of 'moderate symptoms' or 'moderate difficulty in social, occupational, or school functioning.'" *Lacroix v. Barnhart*, 465 F.3d 881, 883 (8th Cir.2006) (quotation omitted).

Here, the record demonstrates that a treating source, Kuenning, found Viers to have GAF scores of 50 on July 31, 2001 [10] and December 10, 2003.[11] In both of Kuenning's reports, Kuenning noted that Viers' highest GAF scores in each year was 55. The record, however, contains no reports which verify that Viers actually had a GAF score of 55 in 2001 or 2003. The record only confirms a GAF score of 50 for Viers in 2001 and 2003. Furthermore, on February 11, 2004, a consultative, non-examining source, Dr. Lovell, noted that Viers, while in remission from substance use, had a GAF score "estimated at 50, suggesting moderate limitations." [12]

The Court draws two conclusions from this evidence. First, the record clearly demonstrates that Viers had a GAF score of 50 both during her substance use (2001) and when her substance use was in remission (2003, 2004). Second, Dr. Lovell incorrectly found that a GAF score of 50 suggested "moderate limitations." *See Brueggemann*, 348 F.3d at 695 (a GAF score of 50 "reflects serious limitations in the patient's general ability to perform basic tasks of daily life."). Accordingly, having reviewed the entire record, the Court finds that the ALJ erred in determining that a GAF score of 50 only suggested "moderate" limitations, instead of "serious" limitations. Furthermore, the ALJ failed to fully and fairly develop the record with regard to Viers' GAF score of 50, and in turn, the implications of Viers substance use on her impairments and limitations with a GAF score of 50. Moreover, the Court finds that the ALJ failed to fully and fairly develop the record with regard to the medical evidence in general.[13] Accordingly, the Court finds that remand in necessary.

9. *See* Administrative Record at 22.

10. *See* Administrative Record at 350.

11. *Id.* at 337.

12. *Id.* at 361.

13. The ALJ's decision provides very little discussion of any medical evidence. The Court will address Viers second and third argu-

On remand, the ALJ shall fully and fairly develop the record with regard to Viers' GAF score of 50. Specifically, the ALJ must consider Viers' limitations in light of the level of functioning for a GAF score of 50 as discussed in the *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Revision 2000). *See Hudson ex rel. Jones*, 345 F.3d at 662 n. 2; *Brueggemann*, 348 F.3d at 695. The ALJ must also consider those limitations in the context of Viers' substance use and remission and fully explain his findings. *See Brueggemann*, 348 F.3d at 695 (an ALJ is required to develop a full and fair record and support his or her conclusions with substantial evidence). Furthermore, the ALJ should fully and fairly develop the record with regard to the medical evidence in general, including Viers' problems with cellulitis. Lastly, because the ALJ relied on Dr. Lovell's incorrect opinion that a GAF score of 50 only suggests "moderate" limitations, the Court determines that the ALJ should order a new consultative examination of Viers. *See Barrett v. Shala-*

*la*, 38 F.3d 1019, 1023 (8th Cir.1994) (medical examinations and tests may be ordered when the medical records presented to the ALJ constitute insufficient medical evidence to determine whether the claimant is disabled).

### C. Reversal or Remand

■ The scope of review of the Commissioner's final decision is set forth in 42 U.S.C. § 405(g) which provides in pertinent part:

> The court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with our without remanding the cause for a rehearing.

42 U.S.C. § 405(g). The Eighth Circuit Court of Appeals has stated that:

> Where the total record is overwhelmingly in support of a finding of disability and the claimant has demonstrated his [or her] disability by medical evidence on the record as a whole, we find no need to remand.

---

ments here because they relate to the ALJ's poor discussion of the medical evidence in general. In Viers second argument, she contends that the ALJ failed to fully and fairly develop the record with regard to her cellulitis. *See* Administrative Record at 417–19 (overnight stay in hospital for cellulitis), 425 (7 days in hospital for cellulitis), 448 and 451 (3 days in hospital for cellulitis). The ALJ's decision lacks any discussion of Viers' cellulitis. The Commissioner argues that the lack of any discussion of cellulitis in the ALJ's decision implies that the ALJ did not consider the condition to cause any work limitations for Viers. Viers, however, maintains that being hospitalized 10 days between August 2004 and April 2005 reflects poorly on her ability to regularly attend any type of work. The Court is not convinced that Viers offers a compelling argument, but because the ALJ failed to address, or even develop the record on this issue, the Court is unable to make any determination on whether Viers' cellulitis is an impairment which limits her ability to work. The Court also notes that Viers ap-

peared at the administrative hearing without representation. Thus, the ALJ had a heightened duty to develop the relevant facts of her case. *Highfill v. Bowen*, 832 F.2d 112, 115 (8th Cir.1987). The ALJ failed to comply with this duty. In her third argument, Viers asserts that the ALJ erred because his decision is not supported by substantial medical evidence. The Court notes that in making his RFC determination, the ALJ relied heavily on Dr. Lovell's incorrect opinion that a GAF score of 50 suggests only "moderate" limitations. An ALJ has the responsibility of assessing a claimant's RFC, and his or her assessment must be based on all of the relevant evidence. *Guilliams*, 393 F.3d at 803. Due to his reliance on Dr. Lovell's incorrect opinion, the ALJ clearly failed to base his RFC finding on all the relevant evidence and his decision is not supported by substantial evidence in the record. The Court finds that this case should be remanded for further consideration of both of these issues. The remand order for these issues will be more fully discussed in the body of this decision.

*Gavin v. Heckler*, 811 F.2d 1195, 1201 (8th Cir.1987); *see also Beeler v. Bowen*, 833 F.2d 124, 127 (8th Cir.1987) (finding reversal of denial of benefits was proper where "the total record overwhelmingly supports a finding of disability"); *Stephens v. Sec'y of Health, Educ., & Welfare*, 603 F.2d 36, 42 (8th Cir.1979) (explaining that reversal of denial of benefits is justified where no substantial evidence exists to support a finding that the claimant is not disabled). In the present case, the Court concludes that the medical records as a whole do not "overwhelmingly support a finding of disability." *Beeler*, 833 F.2d at 127. Instead, the ALJ simply failed to fully and fairly develop the record with regard to Viers' GAF score of 50, the implications of Viers substance use on her impairments and limitations with a GAF score of 50, and the medical evidence in general. Accordingly, the Court finds that remand is appropriate.

### VI. CONCLUSION

The Court concludes that this matter should be remanded to the Commissioner for further proceedings. On remand, the ALJ should develop the record fully and fairly with regard to Viers' GAF score of 50, including consideration of Viers' limitations in light of the level of functioning for a GAF score of 50 and in the context of Viers' substance use and remission. The ALJ should also fully and fairly develop the record with regard to the medical evidence in general, including Viers' problems with cellulitis. Lastly, the ALJ should order a new consultative examination of Viers.

### VII. ORDER

For the foregoing reasons, it is hereby **ORDERED:**

This matter is **REVERSED** and **RE-MANDED** to the Commissioner of Social Security pursuant to sentence four of 42 U.S.C. § 405(g), for further proceedings as discussed herein.